IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 13–cv–02453–KMT

WHITLOCK PACKAGING CORPORATION,

      Plaintiff,

v.

BRIAN STEARNS, and
FUZZEEBEE BEVERAGE, LLC,

      Defendants.

---

## ORDER

---

      This matter is before the court on "Plaintiff/Counterclaim Defendant Whitlock Packaging Corporation's Motion for Summary Adjudication of Counterclaims and Brief in Support" (Doc. No. 86 [Mot.], filed November 7, 2014). Defendants/Counterclaimants Brian Stearns and Fuzzee Bee Beverages, LLC filed their response on November 28, 2014 (Doc. No. 95 [Resp.]), and Plaintiff/Counterclaim Defendant filed its reply on December 12, 2015 (Doc. No. 103 [Reply]). This motion is ripe for ruling.

### STATEMENT OF THE CASE

      Defendant/Counterclaimant Brian Stearns ("Steans") formulated an energy drink called ZŪN and a unique "rocket" bottle and then created Defendant Fuzzee Bee Beverages, LLC ("Fuzzee Bee") to develop, patent, and sell ZŪN across the United States. (*See* Doc. No. 167 at 2.) Defendants and Plaintiff Whitlock Packaging Corporation ("WPC") entered into two

contracts—the first for the purchase of membership in Fuzzee Bee as a strategic investor and the second for a co-packaging agreement.  (*See id.* at 2-3.)

Defendants/Counterclaimants Brian Stearns and Fuzzee Bee Beverages, LLC assert four claims against Plaintiff: (1) Breach of Contract related to a Manufacturing and Packaging Agreement ("Packaging Agreement"); (2) Breach of Contract related to an Amended Contract Manufacturing and Packaging Agreement ("Amended Packaging Agreement"); (3) Fraud; and (4) Breach of Fiduciary Duty.[1]  (*See* Doc. No. 44 [Countercl.], ¶¶ 113-150.)

## UNDISPUTED FACTS

1.      Fuzzee Bee was formed as a Colorado, LLC in 2008, to sell and market ZŪN energy drink. (*See* Mot., Ex. 1, Stearns depo., 19:15-17; 27:13-14.)

2.      At all pertinent times, WPC has been a full-service manufacturer and packager of non-carbonated beverages.  (See http://www.whitlockpkg.com.)

3.      On June 4, 2010, WPC, through its President, Peter H. Rosso ("Rosso"), and Fuzzee Bee, through its Manager, Stearns, executed a Letter of Intent concerning WPC acquiring 30% of Fuzzee Bee's issued and outstanding membership units in exchange for cash and the extension of credit to Fuzzee Bee. (*See* Mot., Ex. 4.)

4.      On or about June 21, 2010, FBB, WPC, and Stearns entered into a Membership Interest Purchase Agreement.  (*See* Mot., Ex. 5, WPC 0033-0042 ["Membership Agreement"].).

5.      On or about June 21, 2010, WPC and Fuzzee Bee entered into a Packaging Agreement.  (*See* Mot, Ex. 6.)

---

[1] Defendants/Counterclaimants remaining claims have been dismissed.  (*See* Doc. Nos.  66, 167.)

6.      Prior to June 2010, Fuzzee Bee had a relationship with a co-packer, Carolina Beer & Beverage.  (*See* Mot., Ex. 7.)

7.      CBB, as WPC's third-party provider, began production of ZŪN in August 2010. (*See*  Mot., Ex. 8.)

8.      During the time between June 2010 and April 2012, there were issues with production, packaging and shipping of Fuzzee Bee's products.  (*See* Countercl.; Mot., Ex. 9.)

9.      On August 24, 2011, Rosso emailed Stearns to arrange a discussion of open items including the upcoming CBB shutdown in November, the supplier cost structure, and pricing of can product to QuikTrip. (*See* Mot., Ex. 12.)

10.     Stearns responded on the same date and added additional discussion items numbered 4 – 10 to Rosso's list, including no. 9, seeking a short term loan and extension of invoice payment terms. (*See* Mot., Ex. 13.)

11.     On November 23, 2011, Rosso advised Stearns by email of his analysis of the ZŪN business and advised Stearns that WPC's Board was not "willing to extend a loan and recommend [sic] that Fuzzee Bee issue a capital call and look for other investors."  (*See* Mot., Ex. 14.)

12.     Rosso's November 23, 2011, email triggered a series of communications between Stearns and Rosso.  (*See* Mot., Ex. 15.)  This email exchange included the following:

a.      Rosso's email to Stearns of November 23, 2011. (*See* Ex. 15 at Stearns_11242-_11243.)

b.      Stearns' email to Rosso dated November 28, 2011, where he copied FBB's legal counsel, Brendan Chatham, stated:

Pete:

In re-reading your email over the holiday…there are several things that need to be discussed in regards to your email:

1) I need the report I've requested repeatedly as it relates to the $500,000 line of credit.

2) I have records of damaged product that I need credit for and need to send directly to you so your staff doesn't create more problems.

3) Your fiduciary obligations to my company and how to manage the ongoing conflict of interest due to the structure of our co-packaging/equity deal.

4) Moving forward with my improving the manufacturing of my product line and extension of payment terms.

5) Finished goods inventory in Denver.

As for your costs & profit and loss, I hope I don't need to point out that you invested in a start up. Or maybe I do… My sales have not been soft for a brand at my stage and I take offense to that. I've exceeded my obligations to my investors and have reach [sic] accounts generally only accessible by big brands. You imply that ZŪN is not doing well; however we are doing exceptionally well in light of very limited resources and continuous subpar product WPC has turned out that customers keep rejecting.

Let's get real here…**the loss you report is due 100% to poor WPC management and performance** and not at all due to my progress or dedication. I am very disappointed with your criticism in light of my repeated efforts to get WPC to focus on performing your co-packing obligations and also have the best interest of ZŪN in mind when doing so. You know all the problems that have been caused by WPC's staff to date as we've discussed this numerous times, and I've politely put you on notice, but it is now past due that you correct these issues. The main reason for restructuring the co-packing agreement with the equity kicker that gives WPC 30% of my company was to give WPC a long term interest in the growth of the ZŪN brand. Basically, Fuzzee Bee is supposed to get the favorable pricing and $500k line of credit to help manage cashflow while WPC gets a big equity stake in Fuzzee Bee. Fuzzee Bee was supposed to be able to grow the ZŪN brand off retained earnings without having to raise a bunch of new capital which would dilute both of us. Now all you are focusing on is WPC's loss on the co-packaging side of the deal which is all due to WPC mismanagement and performance failures. **That couldn't be a more unfair perspective and I'm not happy about it.**

I'm also very concerned that you are selling my inventory without notifying me. I found out through [sic] from Big Lots, a discount chain. I think this should have been discussed and also raises more questions if you have Fuzzee Bee's best interests in mind. Putting aside that you have no contractual right to sell my ZŪN inventory, I've asked for some type of sampling allowance for over a year and you never would do it, but now you're okay selling my inventory at a reduced case price to a bargain bin?

I've also overlooked that WPC was supposed to provide me finished goods at a Denver designated location and I have been paying for shipments [sic] here when this should have been delivered by WPC per the co-packing agreement. For 2012 we plan on local expansion and will need that reasonable level of product here in Denver ASAP for samples and for expansion. I will submit the request next week. I've arranged for national distribution and [sic] in process of closing other deals. So it is evident that I have a viable brand poised for growth. However, WPC's failure to perform is holding us back.

That's why it makes sense for WPC to step up with a loan to help bridge my company's additional capital requirements. Now you tell me that you're not going to make the loan anymore basing your decision on WPC's supposed loss on ZŪN. That's pretty messed up in my view. I want to resolve our issues and have a compatible relationship, however I believe WPC needs to become proactive and not reactive. The bottom line is that WPC is in default of our co-packing agreement and has been for some time.

You've also made a lot of empty promises to me in regards to your abilities to help my company, put me in front of other investors and potential distribution partners. You need to revisit these promises and open up your contacts to help find additional capital for Fuzzee Bee. Of course, I will ask my board and advisors to do the same, but they are going to be dumbfounded that WPC has dropped the ball so badly on this project.

I will work on my 12 week rolling forecast (I assume that's what you meant instead of "12 month") for you and have that for you by the 1st of the year. The 8000 cases of inventory you mentioned should be good till then, provided its quality is up to specs. Pete, our bottom line here is that WPC's repeated failures have put us in a difficult spot and we now need to figure out how best we can repair out relationship. It's not going to be easy since you clearly have forgotten the purpose of putting our deal together the way (sic) did. However, I think we need to sit down and determine what we can do for each other to make the relationship work better. If that means reviewing and reworking the co-packing agreement, by all means, let's meet and talk about it ASAP. For instance, if you need higher margins to give WPC more incentive to improve performance to the standard required by the co-packing agreement, let's look at that. Of course, you'll need to give on the equity kicker and be accommodating on the payment terms and be committed to helping with the capital needs in some way.

I copied Brendan on this email and he is ready and able to help us with re-working the co-packing agreement. Let's not waste any more time and piss away our opportunity with ZŪN. Call me this week to set up a time to meet and get this deal back on track

Sincerely,

Brian Stearns

(See Mot., Ex. 15, Stearns_11239 – _11241 [emphasis in original].)

       c.      Rosso responded by his email to Stearns of November 28, 2011, at 4:19

p.m., which provided:

Brian,

I can appreciate your disappointment in our decision but i was surprised at the tone of your note and the lack of responsibility you have taken for the brands peformance.  Summarizing what i wrote below, WPC will continue to abide by the terms of the contract manufacturing and packaging agreement.

Responses to your letter are in blue below.

**Pete Rosso**
**President and CEO**



Pete:
In re-reading your email over the holiday… there are several things that need to be discussed in regards to your email:
1)    I need the report I've requested repeatedly as it relates to the $500K line of credit.

Your characterization of the $500k commitment as a line of credit is incorrect.  It's purpose is defined in both the contract manufacturing and packaging agreement and in the Fuzzee Bee Beverage LLC Membership Interest Purchase Agreement.   The lanuage on our committment is explicit

"WPC agrees to procure raw materials, ingredients, packaging supplies and finished goods as needed to

perform its obligations pursuant to this Agreement.  WPC agrees to  commit up to $500,000 as needed for the out of pocket costs inccured by WPC for such raw material and/or finished goods inventories,as applicable  (the Cost Advance Limit).  Our financial period ended yesterday.  I will have a report with the Cost Advance Limit to you by Thursday.  On a side note, i do not understand the concern on your part as we have never restricted the procurement of raw materials or finished goods.

2)    I have records of damaged product that I need credit for and need to send directly to you so your staff doesn't create more problems.

Per the agreement, all product damages are eligible for reimbursement.  Please forward your requests for credit to my attention.

3)    Your fiduciary obligations to my company and how to manage the ongoing conflict of interest due to the structure of our co-packing/equity deal.

I don't understand this comment at all and disagree with your assertion.  If you could please provide more detail on the conflict of interest and how we are not living up to our fiduciary responsibility i would be happy to review your concerns.

4)    Moving forward with my improving the manufacturing of my product line and extension of payment terms.

I don't understand this comment either.  All product is being shipped in specification per the agreement. Payment terms are clearly defined in the contract manufacturing and packaging agreement as Net 45 days.  I have expressed a willingness to extend terms to help your cash flow and will honor this agreement for a period of time.  However, it will be important for WPC as both an investor and contract manufacturer to understand your go forward plans.

5)    Finished goods inventory in Denver.

I don't know what you are referencing here other than you keep talking about inventory in Denver at WPC cost which is not agreed to in either agreement.  If you have some other document or communication subsequent to the execution of these agreements that support your position please supply them.

As for your costs & profit and loss, I hope I don't need to point out that you invested in a start up. Or maybe I do… My sales have not been soft for a brand at my stage and I take offense to that.  I've exceeded my obligations to my investors and have reach accounts generally only accessible by big brands.  You imply that ZUN is not doing well; however we are doing exceptionally well in light of very limited resources and continuous subpar product WPC has turned out that customers keep rejecting.

Please provide a list of the subpar product that Whitlock has supplied into the market.  If you are referencing the shorter code product issued to your new DSD partner in Minnesota i can assure you that all product met specification and was shipped based upon FIFO.  Our policy is to ship all products within FIFO unless otherwise requested.  In spite of not receiving instructions to ship out of FIFO we honored your request to ship replacement inventory to your DSD distributor at WPC's cost.

Let's get real here… **the loss you report is due 100% to poor WPC management and performance** and not at all due to my progress or dedication.  I am very disappointed with your criticism in light of my repeated efforts to get WPC to focus on performing your co-packing obligations and also have the best interest of ZUN in mind when doing so.  You know all the problems that have been caused by WPC's staff to date as we've discussed this numerous times, and I've politely put you on notice, but it is now past due that you correct these issues.

The cost of supporting ZUN is not the result of mismanagement as you state.  Please provide documentation on the "numerous" times that WPC did not fulfill their co-packing obligations. The P&L

information was provided to you as a courtesy on why we are unwilling at this time to make further investments in ZUN. In the future we will just provide our answer. WPC definitely miscalculated our ability to reduce the overall case cost per unit on ZUN (This was driven by both internal and external factors). However, we have not asked for a price increase nor will we. We will supply Fuzzee Bee beverage product based on the agreed upon terms in the contract manufacturing agreement. This decision will only result in continued losses for WPC.

The main reason for structuring the co-packing agreement with the equity kicker that gives WPC 30% of my company was to give WPC a long term interest in the growth of the ZUN brand. Basically, Fuzzee Bee is supposed to get the favorable pricing and $500k line of credit to help manage cashflow while WPC gets a big equity stake in Fuzzee Bee. Fuzzee Bee was supposed to be able to grow the ZUN brand off retained earnings without having to raise a bunch of new capital which would dilute both of us. Now all you are focusing on is WPC's loss on the co-packing side of the deal which is all due to WPC mismanagement and performance failures. **That couldn't be a more unfair perspective and I'm not happy about it.**

The agreements speak for themselves from our perspective. The one comment i will offer you is this. You are definitely getting a below market rate for both can and bottle products. If you believe this not the case please provide us with alternative packers especially for the bottled product. I do agree that Fuzzee Bee was suppose to grow their business through retained earnings yet you are now looking for additional capital. Why is this? Is volume soft? Is it a lack of accounts or sell through?

I'm also very concerned that you are selling my inventory without notifying me. I found out through from Big Lots, a discount chain. I think this should have been discussed and also raises more questions if you have Fuzzee Bee's best interest in mind. Putting aside that you have no contractual right to sell ZUN inventory, I've asked for some type of sampling allowance for over a year and you never would do it, but now you're okay selling my inventory at a reduced case price to a bargain bin?

Your assertion that we have sold your inventory without notifying you is completely false. We have only one customer for ZUN and that is Qtrip. There was some discussion with Big Lots regarding the sale of product to them just like there has been with other customers. Our discussions with Big Lots have not yielded any sales. Feel free to contact them directly.

I've also overlooked that WPC was supposed to provide me finished goods at a Denver designated location and I have been paying for shipments to here when this should have been delivered by WPC per the co-packing agreement. For 2012 we plan on local expansion and will need that reasonable level of product here in Denver ASAP for samples and for expansion. I will submit the request next week.

I addressed this earlier and would you request that you direct me to where in the agreement this was agreed to and or any subsequent communication.

I've arranged for national distribution and in process of closing other deals. So it is evident that I have a viable brand poised for growth. However, WPC's failure to perform is holding us back.

We disagree with your assertion that WPC is holding you back.  In fact, the poor sales performance and pending delisting at Qtrip is the result of poor sell through.  As for your numerous claims that you aren't getting a quality product, Qtrip has never notified us of any quality issues with the product supplied. Rather, their concern is the lack of sell through currently In spite of promoting the product.  Since i don't have access to your other customers i would like to see documentation of the nature and scope of the problems they have experienced with ZUN if any.

That's why it makes sense for WPC to step up with a loan to help bridge my company's additional capital requirements.  Now you tell me that you're not going to make the loan anymore basing your decision on WPC's supposed loss on ZUN.  That's pretty messed up in my view.  I want to resolve our issues and

have a compatible relationship, however I believe WPC needs to become proactive and not reactive.  The bottom line is that WPC is in default of our co-packing agreement and has been for some time.

We disagree with your assertion that we are in default of the copacking.  This assertion is patently false.  If you believe in your assertion you have remedies under the contract and i would encourage you to exercise them

You've also made a lot of empty promises to me in regards to your abilities to help my company, put me in front of other investors and potential distribution partners.  You need to revisit these promises and open up your contacts to help find additional capital for Fuzzee Bee. Of course, I will ask my board and advisors to do the same, but they are going to be dumbfounded that WPC has dropped the ball so badly on this project.

I would caution you on how you express your opinions about WPC to others in the beverage industry as our reputation is impeccable which we are willing to protect by any legal means available.

I will work on my 12 week rolling forecast (I assume that's what you meant instead of "12 month") for you and have that for you by the 1st of the year.  The 8000 cases of inventory you mentioned should be good till then, provided its quality is up to specs.

Pete, the bottom line here is that WPC's repeated failures have put us in a difficult spot and we now need to figure out how best we can repair our relationship.  It's not going to be easy since you clearly have forgotten the purpose of putting our deal together the way did.  However, I think we need to sit down and determine what we can do for each other to make the relationship work better.  If that means reviewing and re-working the co-packing agreement, by all means, let's meet and talk about it ASAP.  For instance, if you need higher margins to give WPC more incentive to improve performance to the standard required by the co-packing agreement, let's look at that.  Of course, you'll need to give on the equity kicker and be accommodating on the payment terms and be committed to helping with the capital needs in some way.

We are not requesting nor do we have a desire to re-work the co-packing agreement.  We will continue to abide by the terms of the copacking agreement as we have to this point.  Please provide your 12 week rolling forecast no later than December 15, 2011 as it is critical for us in our materials planning process.

I copied Brendan on this email and he is ready and able to help us with re-working the co-packing agreement.  Let's not waste any more time and piss away our opportunity with ZUN.  Call me this week to set up a time to meet and get this deal back on track.

Sincerely,

Brian Stearns

(*See* Mot., Ex. 16 [highlighting in original]; Ex. 15, Stearns_11239-_11240.)

        d.      On November 28, 2011, at 7:34 p.m., Stearns responded to the breach of

fiduciary duty allegation by email to Rosso that stated, in part:

       Pete, thanks for the quick response, my answers to your answers are in red.

                            ****

3)    Your fiduciary obligations to my company and how to manage the ongoing conflict of interest due to the structure of our co-packing/equity deal.

I don't understand this comment at all and disagree with your assertion.  If you could please provide more detail on the conflict of interest and how we are not living up to our fiduciary responsibility i would be happy to review your concerns.

You are basically telling me that WPC is your priority. This comment specifically. "***There is no margin in the bottle to support market launches***" no margin for who? In addition, your staff has stated the same telling me in writing that they are 100% loyal to WPC doesn't bode well. Followed with this email that states you are not bridging a loan and supporting my company due to a WPC loss.. I don't believe your increasing costs, replacing damaged product and other loss should reflect on your support of my company or in framing my company to your board in a negative light, doesn't seem to have my company's best interest in mind from my perspective.    In addition, your lack of support offering me samples to grow my brand and instead selling off inventory to big lots adds to this perspective.  We can discuss next time we speak.

(*See* Mot., Ex. 15, Stearns_11239.)

        e.      Pete Rosso responded by email at 8:08 p.m. on November 28, 2011, which

stated:

Brian,

This has taken on a very negative tone.  You seem to think WPC is a bank.  it's not. We have already financially taken on more than is required in the Contract Manufacturing Agreement.  In fact, the only reason we have not addressed certain costs with you is because of our desire to see the brand succeed and not starve Fuzzee Bee of working capital.  However, enough is enough and i believe your responses below demonstrate a lack of understanding of the big picture.

Therefore, as i stated in my prior response below you have remedies under the contract as does WPC.  We will manage the relationship accordingly. As for the requested credits, all will have to be supported by either customer deductions or proof of  retrieval of the product.  Please forward your credit requests at your earliest convenience so you can be reimbursed promptly.  Additionally, we will need your 12 week rolling forecast no later than this friday.  This is an ongoing requirement of Fuzzee Bee in the contract manufacturing and packaging agreement.   You will have your "Cost Advance Limit" report you requested from us tomorrow as i have contacted Keith Bishop to move it up on the priority list and get it completed.

**Pete Rosso**
**President and CEO**

(*See* Mot., Ex. 15, Stearns_11237.)

13. On December 27, 2011, at 8:30 a.m., Rosso sent Stearns an email discussing the

foregoing correspondence, the disposal of 6000 cases of product for packaging issues, and the

identification of 840 cases to be destroyed for off-code issues.  That email stated:

> Unless there is an objection on your part we plan to close out the 3 date codes of
> regular and 1 date code of lite to Big Lots this month since we stand to lose
> almost $60k on this inventory when it expires. In addition, you requested that this
> inventory NOT be sent to your newer customers because of short coding. Unless i
> [sic] hear back we will be moving this out in the next 2 weeks.

(*See* Mot., Ex. 17, Stearns_0209-_0211, attached as Exhibit 17.)

14. Rosso sent another email on December 27, 2011, at 9:12 a.m., stating: "Sounds

good… the other immediate thing we want to get done is close out the short coded items.  (See

Mot., Ex. 17, Stearns_0208, included in Exhibit 17.)

15. Stearns conditionally approved the Big Lots transaction by an email of December

27, 2011, at 10:15 a.m., which stated:

| From: | "Brian Stearns" <b.stearns@zunenergy.com> |
|---|---|
| To: | <rossop@whitlockpkg.com> |
| Date: | 12/27/2011 10:15 AM |
| Subject: | RE: Zun follow up |

That's fine with me as long as Big Lots receives complete clean product that has fins and no defectives.  I just want to make sure we are on same page with this. If its on the market it needs to be to spec

(*See* Mot., Ex. 17, Stearns_0207.)

16.    Continuing to pursue the resolution of the issues between the parties, Stearns negotiated with Rosso regarding the co-packing problems.  (*See* Mot., Ex. 19.)

17.    On April 13, 2012, Fuzzee Bee and WPC entered into a First Amendment Relating to Contract Manufacturing and Packaging Agreement, which modified the terms and conditions of the parties' previous Packaging Agreement, eliminating WPC's obligation to produce the rocket bottle, removing all provisions, commitments or references pertaining to the rocket bottle, providing for various credits to FBB, and providing for destruction at WPC's expense of the finished goods and materials related to the bottle product.  (*See* Mot., Ex. 20.)

18.    On or about April 23, 2012, Fuzzee Bee and WPC entered into a Redemption Agreement whereby it was agreed that FBB redeem from WPC 5,910 of its FBB membership units.  As a result, after April 23, 2012, WPC's interest in FBB was reduced to 12,206 membership units.  WPC also executed an Acknowledgement to the FBB Operating Agreement setting forth the number of membership units owned.  (*See* Mot., Ex. 21.)

19.    On or about April 23, 2012, WPC, Fuzzee Bee, and Stearns entered into a Release Relating to Fuzzee Bee Beverage, LLC, which provided, in part:

*THIS RELEASE* (the "Release") is made and entered into as of this __23__ day of April, 2012 by and between *WHITLOCK PACKAGING CORPORATION* ("WPC"), *FUZZEE BEE BEVERAGE, LLC* ("FB") and *BRIAN STEARNS* ("Stearns"). FB and Stearns are sometimes collectively referred to herein as the "FB Parties".

*WHEREAS*, on June 21, 2010 the parties to this Release, in various capacities, entered into a Contract Manufacturing and Packaging Agreement, and a Membership Purchase Agreement (the "Existing Agreements"); and

*WHEREAS*, contemporaneously with this Release, the parties entered into the First Amendment to the Contract Manufacturing and Packaging Agreement (the "Amendment") and that certain Redemption Agreement and related instruments of even date herewith (the "Redemption Agreement"); and

*WHEREAS*, the Amendment contains various monetary concessions, some of which relate to alleged quality issues involving FB's 12 oz. plastic bottle product known marketed under the brand name "Zun" and the Redemption Agreement provides that WPC redeem a portion of its membership interest in FB in consideration of FB entering into this Release; and

*WHEREAS*, the parties now desire to settle said plastic bottle quality issues.

### NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

1.    *RELEASE BY FB PARTIES*: The FB Parties for themselves, any spouse, heir, executor, administrator, or assign, hereby unconditionally release and forever discharge WPC and their past or present predecessors, successors, assigns, employees, agents, representatives, related corporate and business affiliates, attorneys, and all persons acting by, through, under or in concert with any of them, from any and all payment obligations, claims, liabilities, obligations, promises, agreements, controversies, costs and expenses, of any nature whatsoever whether known or unknown, with respect to or arising in any way in connection with the 12 oz. plastic bottle in a rocket ship configuration that has sometimes been used by FB to produce and market the Zun Energy drink as contemplated by the Existing Agreements.

(*See* Mot., Ex. 22.)

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## ANALYSIS

### 1.    *Breach of Packaging Agreement Claim*

WPC argues Counterclaim I for Breach of the Packaging Contract is without merit given the undisputed fact related to the negotiated release of the rocket bottle claims in April 2012. (Mot. at 27.)  As such, WPC argues it is entitled to summary judgment.  (*Id.*)

To prevail on a claim for breach of contract under Oklahoma law[2], a litigant must prove (1) formation of a contract, (2) breach of the contract, and (3) damages as a direct result of the breach.  *Digital Design Group, Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001).  The first step in contract interpretation is to "give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful."  *McKissick v. Yuen*, 618 F.3d 1177, 1184 (10th Cir. 2010).  When a written contract exists, the intention of the parties, "is to be ascertained from the writing alone, if possible."  *McKissick*, 618 F.3d at 1184 (quoting Okla. Stat. tit. 15, § 155).  "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."  Okla. Stat. tit. 15, § 158.  When contractual language is clear and unambiguous, interpretation is a question of law for the court and properly decided on summary judgment.  618 F.3d at 1184.

---

[2] The parties do not dispute that Section 18.2 of the Packaging Agreement provides the contract is to be "governed by, construed and enforced in accordance with the laws of the State of Oklahoma."  (Mot., Ex. 6 at 11, ¶ 18.)

The primary contracts that must be examined with respect to this claim were executed in April 2012, as part of a settlement agreement between WPC, Fuzzee Bee, and Stearns, and consist of four separate documents: (1) the Amended Packaging Agreement; (2) the Redemption Agreement; (3) the Release Relating to Fuzzee Bee ; and (4) the Acknowledgement of Redemption.  (*See* Mot., Exs. 19-22.)  WPC argues these documents, taken together, were the result of lengthy negotiations and revisions between the parties with the advice and assistance of their respective counsel.  (*Id.* at 28 [citing Ex. 1 ("Stearns Depo.") at 169:13-172:15, 172:22-25, 174:8-175:4; Ex. 19.)

WPC argues that, continuing from the November 2011 discussions between FBB and WPC, Stearns sent emails to Rosso on February 7, 2012, and February 12, 2012, detailing his thoughts on the challenges and problems that had occurred in packaging ZŪN in the rocket bottle and the damage he perceived such challenges and problems were having on the ZŪN brand.  (*Id.* [citing Exs. 14-15].)  In this correspondence, Stearns described the bottle production contract as an "epic failure" that "continues to cause major damages to my brand and my investors and partners and equally taints the reputation of my product in consumer's eyes."  (*Id.* [citing Ex. 19].)  Stearns also presented some thoughts on resolving the issues between the parties and moving forward with production of ZŪN in cans only.  (*Id.*)

Rosso followed up with Stearns a few days later proposing terms of an agreement on a go forward basis which, among other things, would eliminate the requirement of WPC to produce ZŪN in the rocket bottle, release WPC from any and all claims related to the quality issues experienced on the bottle product since the effective date of the original contract, and provide certain credits to FBB.  (*Id.*, 02/15/12 email Rosso to Stearns.)  Stearns responded the next day

reiterating the difficulties the packaging problems had allegedly created and stated that "other items need to be addressed if we are to agree to" eliminate the requirement of WPC to package the rocket bottle and release WPC from any and all claims related to quality issues on the bottle product since the effective date of the Co-Packaging Agreement. (*Id.*, 02/16/12 email Stearns to Rosso.)

Following additional conversations between the parties, Rosso responded to Stearns on February 22, 2012, setting out the terms of a settlement agreement. (*Id.*, 02/22/12 email Rosso to Stearns.) After further discussion, the parties reached an agreement which led to the drafting and execution of the aforementioned settlement documents. (Ex. 19.) The Release expressly provides:

> 1. RELEASE BY FB PARTIES: The [Fuzzee Bee] Parties for themselves, any spouse, heir, executor, administrator, or assign, hereby unconditionally release and forever discharge WPC and their past or present predecessors, successors, assigns, employees, agents, representatives, related corporate and business affiliates, attorneys, and all persons acting by, through, under or in concert with any of them, from any and all payment obligations, claims, liabilities, obligations promises, agreements, controversies, costs and expenses, of any nature whatsoever whether known or unknown, with respect to or arising in any way in connection with the 12 oz. plastic bottle in a rocket ship configuration that has sometimes been used by FB to produce and market the ZŪN Energy drink as contemplated by the Existing Agreements.

(Ex. 22.)

The court agrees with WPC that, based on the evidence presented, Stearns and Fuzzee Bee were fully aware of all alleged problems pertaining to packaging ZŪN in the rocket bottle prior to execution of the settlement documents and release of WPC from any and all claims, known or unknown. In his November 28, 2011, email, which Stearns copied to his counsel, Stearns suggested that the parties review "reworking the co-packing agreement." (Ex. 15,

Stearns_11239 – _11241.)  The Release, First Amendment, and related documents resulted from the parties' discussions and negotiations, which included their respective counsel.  Moreover, Stearns described the re-negotiations as successful and agreed, in his deposition, that they were successful because they resulted in the amended documents in April 2012.  (Ex. 1, Stearns Depo., at 176:12-177:9.)

A release bars claims that "existed by reason of 'matters' that occurred on or before" the effective date of the release.  *McKissick*, 618 F.3d at 1185.  The plaintiff in *McKissick*, a former Gemstar executive, brought claims against the company sounding in fraud.  The district court granted summary judgment in favor of Gemstar finding that McKissick had released her claims at the end of her employment.  *Id.* at 1180.  McKissick appealed.  The Tenth Circuit Court of Appeals affirmed the district court's grant of summary judgment finding, under Oklahoma law, that the language in the release absolving Gemstar from any and all claims of any form or nature whatsoever, broadly and unambiguously, barred McKissick's claim for fraud that occurred before the agreement was signed, even if the alleged fraud was not discovered until after execution of the release.  *Id.* at 1184-85, 1188.

In *McKissick*, the Tenth Circuit cited and relied upon *Cassity v. Pitts*, 839 P.2d 192 (Okla. 1992), in which the Oklahoma Supreme Court addressed the issue of whether release language that "release[d] forever any and all claims of whatsoever nature" barred a claim for fraud that arose subsequent to execution of the settlement agreement.  The Oklahoma Supreme Court held that such broad language:

> . . . clearly contemplates some possible liability or possible future claim in
> addition to that under discussion by the parties at the time the release was
> executed. We think the language in the release was broad enough to cover all
> demands or rights to demand, or possible causes of action, and constituted a

> complete discharge of liability, whether or not the various demands or claims were discussed or mentioned when the release was signed, and whether or not the possible future claims were known.

*Cassity*, 839 P.2d at 195. The Oklahoma Supreme Court affirmed the trial court's grant of summary judgment in favor of the released parties finding that even though the cause of action for fraud had not actually arisen until after the release was signed, the releasing parties suspected fraud had occurred before the release was signed and took no steps to carve out from the release any future claims. Thus, the court held the releasing party was "bound by the unqualified, unambiguous, language of release in the settlement agreement." 839 P.2d at 195.

The only conduct pleaded by Defendants/Counterclaimants in their counterclaim for breach of the Packaging Agreement is pre-settlement, pre-release conduct concerning packaging ZŪN in the rocket bottle. (Countercl. at ¶¶113-121.) The court agrees with WPC that Stearns and Fuzzee Bee were specifically and expressly aware of the problems with respect to the 12 oz. rocket bottle configuration for ZŪN and ZŪN Lite. Correspondence between Stearns and WPC confirms the fact that these problems were continually discussed. Stearns, FBB, and WPC executed the settlement documents in 2012 in order to resolve their disputes concerning the rocket bottle configuration and move forward with packaging only the cans. Because Stearns and FBB were admittedly aware of the packaging problems, suggested reworking the agreement, and knowingly entered into the settlement agreement, of which the Release is part, they cannot now allege breach of contract for matters that arose prior to the settlement.

A release may be set aside where it can " 'be shown that the release was obtained by fraud or misrepresentations . . . which misled the injured party into signing the instrument.' " *Evans v. Bridgeston-Fireston, Inc.*, 904 P.2d 156, 156 (Okla. App. 1995) (quoting *St. Louis &*

*S.F. Ry. v. Chester*, 138 P. 150 (1914)).  The burden of proof is on the party attacking the release to show by clear and convincing evidence that the release was obtained by fraud or misrepresentation.  *Evans*, 904 P.2d at 156 (quoting *Birch v. Keen*, 449 P.2d 700 (Okla. 1969)).  In their response, Defendants/Counterclaimants argue that there was no meeting of the minds and no consideration in the making of the release.  (Resp. at 17-20, 28-29.)  However, Defendants/Counterclaimants make only conclusory statements that "the record shows" and "the evidence shows" there was no meeting of the minds or consideration.  (*See id.* at 18, 26.)  Defendants/Counterclaimants do not cite to where in the record such evidence can be found.  The court has no obligation to sift through all of Defendants/Counterclaimants' evidence to determine if there is a trial-worthy issue.  *See Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000) (holding that the court is "not obligated to comb the record in order to make [a party's] arguments for [it].").  "[O]n a motion for summary judgment, 'it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record."  *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004).

Defendants/Counterclaimants' Response has utterly failed to meet this burden and this failure, in and of itself, is sufficient reason to grant summary judgment on the Breach of Packaging Agreement Claim in favor of WPC, as Defendants/Counterclaimants have failed to demonstrate a genuine issue  for trial on a material matter.  *See Mitchell*, 218 F.3d at 1199 (holding summary judgment is appropriate when an opposition is "limited to conclusory statements and . . . void of cites to the specific portions" of the record containing relevant evidence).

2.      *Breach of Amended Contract Manufacturing and Packaging Agreement*

Defendants/Counterclaims allege in Count II that WPC breached the Amended Packaging

Agreement by failing to destroy the remaining rocket bottle inventory and by failing to provide

the quality of 16 oz. can product promised.  (Countercl., ¶¶ 122-130.)  WPC argues that

Defendants/Counterclaimants' inability to prove each of the breach of contract elements entitles

WPC to summary adjudication on this claim.  (Mot. at 33-35.)

Specifically, WPC argues that the Amended Packaging Agreement altered the parties'

initial agreement by eliminating WPC's obligation to produce the 12 oz. rocket bottle, adding an

agreement by WPC to produce a 16 oz. can product, removing the exclusivity provision,

providing a number of credits to Fuzzee Bee, and providing for destruction, at WPC's expense,

of the remaining finished goods inventory and raw materials inventory.  (*Id.* at 33; *see* Ex. 20.)

First, WPC argues there is no evidence that it failed to destroy the bottle inventory and, instead,

sold the inventory to Big Lots as alleged by Defendants.  WPC argues that documents produced

by Big Lots, pursuant to a subpoena, debunk Defendants' contention.  (*Id.*)  These documents

evidence two separate purchase orders for product ordered by Big Lots in January 2012 and

nothing further.  (*See* Ex. 18.)  Moreover, evidence provided by WPC shows that WPC did what

it contracted to do in the Amended Packaging Agreement and destroyed the ZŪN bottle

inventory. (*See* Ex. 24, emails from April 2012 regarding destruction of ZŪN Inventory,

destruction of Packaging Material, and disposal of Plastic Components.)

Second, WPC argues there is no evidence that any alleged defective production of canned

product was the fault of WPC as opposed to damage, if any, which may have occurred during

shipping or at the hands of third-persons over which WPC had no control.  (Mot. at 34.)  WPC

also argues there is no evidence that any alleged actions of WPC resulted in alleged defective inventory of canned product or was the cause of damages to FBB and/or Stearns.  (*Id.*)

In their response, Defendants/Counterclaimants argue in a conclusive manner "the record evidences WPC's breaches of both promises."  (Resp. at 20.)  However, again, do not cite to any documents or evidence whatsoever in the record to support this claim.  This is sufficient reason to grant summary judgment on the Breach of Amended Contract Manufacturing and Packaging Agreement Claim in favor of WPC.  *See Mitchell*, 218 F.3d at 1199.  Moreover, to the extent Defendants/Counterclaimants attempt to rely on the opinion of their expert, James Hinkle, to show WPC breached its contractual obligations, Mr. Hinkle is a damages expert, and his opinions do not go to the issue of liability and whether the contract was breached.

Again, Defendants/Counterclaimants have failed to bring forth evidence of a genuine issue for trial.  Accordingly, summary judgment is granted in favor of WPC on the Breach of Amended Contract Manufacturing and Packaging Agreement Claim.

### 3.    *Fraud Claim*

WPC argues that Stearns has never articulated any basis for a fraud claim against WPC, and thus it is entitled to summary judgment on this claim.  (Mot. at 35-39.)

Fraud is never presumed.  *Roberts v. Wells Fargo AG Credit Corp.*, 990 F.2d 1169, 1173 (10th Cir. 1993).  To prevail on a claim for fraud, all of the following must be shown by clear and convincing evidence: (i) WPC made a material representation that was false; (ii) that WPC knew when it made the representation that it was false; (iii) that WPC made the false representation with the intention that it should be acted upon by Defendants; (iv) that Defendants acted in reliance upon it; and, (v) that Defendants thereby suffered detriment.  *Silk v. Phillips*

*Petroleum Co.*, 760 P.2d 174, 176-77 (Okla. 1988).  The absence of any one element of fraud is

fatal to a party's claim.  Silk, 760 P.2d at 180.  "The mere fact that fraud is claimed will not

justify the submission of that issue [to the jury] unless facts are produced from which an

irresistible deduction of fraud reasonably arises." *Silk*, 760 P.2d at 177.

> The first and most fundamental element of a fraud claim is a misrepresentation of
> a past or present fact.  Generally, to constitute actionable fraud, false
> representations cannot be predicated upon a promise to perform in the future. . . .
> To render nonperformance of a promise to be performed in the future fraudulent,
> the promise to perform must be 'made with the intent to deceive the promisee into
> acting where he otherwise would not have done so' and be 'accompanied by an
> intention not to perform.'

*Pine Telephone Co., Inc. v. Alcatel-Lucent USA, Inc.*, No. CIV-11-353-JHP, 2014 WL 318331,

at *7 (E.D. Okla. 2014) (internal citations omitted).

> There is a wide distinction between the nonperformance of a promise and a
> promise made mala fide, only the latter being actionable fraud. . . .  Eventual
> failure to perform is not evidence of intent not to do so.  Thus, an allegation that a
> defendant intended to deceive because the alleged promise was not met is
> insufficient as a matter of law.

*Pine Telephone*, 2014 WL 318331, at *7 (internal citations omitted).  Summary judgment will

not be defeated when the only proof in the record to support a claim of intent not to keep

promises made is the fact that such promises were not kept.  *Id.*, at *8 ("Statements that turn out

to be untrue do not prove falsity at the time the statements were made.").  Moreover, steps taken

to fulfill the promise made, by one against whom fraud has been alleged, removes the issue from

the concept of fraud.  *Citation Co. Realtors, Inc. v. Lyon*, 610 P.2d 788, 791 (Okla. 1980).

Defendants/Counterclaimants allege in Count III that WPC made four specific false

representations.  (Countercl., ¶¶ 132-135.)  Defendants/Counterclaimants allege these

representations were knowingly false when made.  (*Id.*, ¶ 136.)  WPC disputes and denies the

claims and argues that there is no evidence in the record to support any allegation of fraud.

(Mot. at 35-39.)

In support of their contention, WPC provides evidence that Stearns testified in deposition,

both individually and as the Rule 30(b)(6) designee for Fuzzee Bee, that the fraud counterclaim

is based only on allegations of unfulfilled promises.  In his individual deposition, Stearns

testified as follows:

228

25 Q. (BY MR. ASKEW) Okay. So -- and I'm asking

229

1 you, do you think that Rosso and Mallick [sic] made promises to
2 you that just got -- never got fulfilled?
3 A. They made statements to me that I believe that
4 -- now -- I believe now that they had no intention of
5 fulfilling, so --
6 Q. Why do you believe they had no intention of
7 fulfilling any statements they made?
8 A. Because I was a passionate founder who
9 continuously asked for those things to happen, and they
10 never happened, so that's why. So they lied to me.
11 Q. So because they never happened, you believe
12 they were false when made. Is that it?
13 A. Yes. Of course.
14 Q. That's it, that's all you have for me?
15 A. No, that's not all I have. I mean, there's
16 more things that I've discussed with my attorney, but
17 we're not going to disclose that right now.
18 Q. Do you have any other answer for my question as
19 to whether you can specifically identify any basis for
20 your allegations as to whether Whitlock made any false
21 representation of any type to Fuzzee Bee?
22 MR. KEESLING: Other than what he's already
23 said.
24 A. Not at this time.
25 Q. (BY MR. ASKEW) Similar question, and if your

230

1 answer is the same, just tell me.
2 A. Okay.
3 Q. But do you have any factual basis for the
4 allegation that Whitlock knew that representations were
5 false when they made them?
6 A. Not at this time, I can't think of specifics,
7 but I'm sure we have some.

(Mot., Ex. 1 at 24-26.)  In his Rule 30(b)(6) testimony concerning the fraud claim, Stearns

testified as follows:

212

16 Q. (By Mr. Askew) Let me withdraw the
17 question and ask this: Mr. Stearns --
18 A. Uh-huh.
19 Q. -- can you identify anything for me today
20 that you believe constitutes evidence of fraud by
21 Whitlock Packaging?
22 MR. KEESLING: Objection; clear legal
23 conclusion.
24 A. Yeah. I mean, Fuzzee Bee Beverage has
25 hired expert attorneys and we're talking with them and

213

1 they're – they're using our information, and they're the
2 legal experts.
3 Q. (By Mr. Askew) Anything else?
4 A. Based on 134 and 135, no, It's – it's
5 attorney-client privilege.

(Ex. 31 at 25-26.)

It is clear from the record that Stearns, either individually or as the person most

knowledgeable on behalf of Fuzzee Bee, can offer no factual basis, other than alleged unfulfilled

promises, to establish the first required element, false representation, in support of the fraud

counterclaim.  An unfulfilled promise is not fraud absent proof in the record that a promise to perform was made with the intent not to keep the promise.  *Roberts*, 990 F.2d at 1173.

In their response, Defendants/Counterclaimants again generally conclude that their claim for fraud, which encompasses the Packaging Agreement and the Membership Agreement, is supported by "circumstantial evidence."  (*See* Resp. at 23, 24.)  Though it is true that in Oklahoma and Colorado[3], circumstantial evidence may be used to prove fraud, *see Griffith v. Scott*, 261 P. 371, 376 (Okla. 1927) and *Kopeikin v. Merchants Mortg. And Trust Corp.*, 679 P.2d 599, 602 (Colo. 1984), Defendants/Counterclaimants again fail to cite to any circumstantial evidence, either circumstantial or direct, in the record that supports their fraud claim.

Accordingly, summary judgment is granted in favor of WPC on the fraud claim and fail to provide evidence of any material matter for trial.  *See Mitchell*, 218 F.3d at 1199.

## 4.    *Breach of Fiduciary Duty Claim*

Finally, WPC moves for summary judgment on Defendants/Counterclaimants' breach of fiduciary duty claim.  (Mot. at 40-44.)

Defendants' Counterclaim alleges that WPC's fiduciary duties are contractual and arose by way of its membership in Fuzzee Bee.  (Countercl., ¶¶ 142-143.)  The Membership Agreement is governed by Colorado law, which provides that to prevail on a claim for breach of fiduciary duty, Defendants/Counterclaimants are required to prove a fiduciary duty existed, the defendant breached that duty, and the breach was the proximate cause of damages.  *Aller v. Law Office of Carole C. Schriefer*, 140 P.3d 23, 26 (Colo. App. 2005).

---

[3] The parties do not dispute that the Membership Agreement is governed by Colorado law.

The undisputed evidence shows WPC was a member of Fuzzee Bee.  However, the undisputed evidence also shows WPC was not a Manager of Fuzzee Bee and did not have the managerial authority set forth in the Fuzzee Bee Operating Agreement.  (*See* Mot., Ex. 4, Operating Agreement, Stearns_0026-0045.)  It is undisputed that the Manager of Fuzzee Bee is Stearns.  (*See id.*)  Defendants/Counterclaimants' response  (*see* Resp. at 26) is devoid of reference to any document which shows WPC owed a fiduciary duty to Defendants/Counterclaimants and is devoid of any explanation or evidence that a fiduciary duty existed.  *See Mitchell*, 218 F.3d at 1199.

As Defendants/Counterclaimants have failed to establish the first element of a fiduciary duty claim, WPC is entitled to summary judgment on the claim.

**WHEREFORE**, for the going reasons, it is

**ORDERED** that "on "Plaintiff/Counterclaim Defendant Whitlock Packaging Corporation's Motion for Summary Adjudication of Counterclaims and Brief in Support" (Doc. No. 86) is **GRANTED**.  It is further

**ORDERED** that, at the conclusion of this case, judgment shall enter in favor of Plaintiff/Counterclaim Defendant Whitlock Packaging Corporation, and against the Defendants/Counterclaimants, Brian Stearns and Fuzzee Bee Beverages, on the counterclaims.  It is further

**ORDERED** that, at the conclusion of the case, Plaintiff/Counterclaim Defendant Whitlock Packaging Corporation will be awarded its costs related to defending the Counterclaim, to be taxed by the Clerk of Court in the time and manner prescribed by Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

Dated this 9th day of April, 2015.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge